**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

FURMAN GILMORE,

                              Plaintiff,

          v.                                                        No. 9:16-CV-1299
                                                                    (GTS/CFH)

THOMAS MERANTE, et al.,

                              Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

Furman Gilmore
16-A-4869
Bare Hill Correctional Facility
Caller Box 20
Malone, New York 12953
Plaintiff pro se

Murphy Burns LLP                          THOMAS K. MURPHY, ESQ.
407 Albany Shaker Road
Loudonville, New York 12211
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

        Plaintiff pro se Furman Gilmore ("plaintiff"), who at the relevant time in question was a

pretrial detainee at the Columbia County Jail ("CCF"), brings this action pursuant to 42 U.S.C.

---

        [1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

§ 1983 alleging that defendants Captain ("Capt.") Thomas H. Lanphear, Jr., Lieutenant ("Lt.") Gardner, Lt. William Hilscher, Sergeant ("Sgt.") Delaney, Corporal ("Corp.") T. Dallas, Corp. Thomas W. Buckley, Corrections Officer ("C.O.") Thomas Merante, C.O. Cody Rockefeller, C.O. Steven Burger, and C.O. Frank Spano – who, at all relevant times, were employed at CCF – violated his constitutional rights under the Fourteenth Amendment. Dkt. No. 32 ("Am. Compl."). Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 50. Plaintiff opposed defendants' motion. Dkt. No. 54. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

## A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II.A infra. Plaintiff alleges that on May 11, 2016, Sgt. Delaney placed him "on cell confinement." Compl. at 9.[2] At the time, plaintiff did not have any misbehavior reports or pending disciplinary actions. Id. On or about May 13, 2016, three "mentally ill inmates" were moved to the "B" block housing unit. Am. Compl. at 4. On May 24, 2016, plaintiff complained to a corrections officer that inmate McCalop, who was locked in the neighboring cell, yelled and banged on the cell wall, preventing plaintiff from sleeping. Id.

---

[2] Plaintiff failed to include his Fourteenth Amendment due process claim in his amended complaint. See generally Am. Compl. Affording the plaintiff special solicitude, the undersigned treated those claims from plaintiff's complaint "replead and incorporated into the amended complaint." Dkt. No. 31 at 8.

Inmate McCalop continued to yell and bang on the cell bars and walls throughout the day, and corrections officers did not tell him to stop. Id. Plaintiff informed the unnamed corrections officer that the inmate's disturbance prevented him from sleeping, and caused him to have chest pains; difficulty breathing; and anxiety attacks. Id. On May 15, 2016, plaintiff made a verbal complaint to Corp. Buckley that the disturbances caused by the mentally-ill inmates prevented him from sleeping and caused him to suffer severe headaches, chest pain, difficulty breathing, and anxiety attacks. Id. at 5. Corp. Buckley informed plaintiff that Capt. Lanphear ordered that plaintiff be housed with the mentally-ill inmates "resulting from plaintiff's request to keep separation from Lellan and James Smith who were housed on 'D' block housing unit." Id. Corp. Buckley informed plaintiff that he could be moved if he signed off on his keep separation request from Lellan and James Smith. Id.

On or about May 15, 2016, inmate Lange caused a disturbance and was removed from the housing unit to receive medical attention. Am. Comp. at 5. Plaintiff informed a corrections officer that he could not sleep due to the Supervisor Officer's order that all cell and housing lights remain on all day and night. Id. Plaintiff requested to speak with the supervisor, but was told that "the Supervisor [was] not in a good mood right now." Id. On or about May 23, 2016, inmate Lange was placed on a drinking water restriction. Id. Pursuant to that restriction, C.O. Rockefeller turned off the water valve that controlled plaintiff and inmate Lange's shared drinking water. Id. From May 23, 2016 through June 4, 2016, plaintiff's sleep was "constantly disturbed" by inmate Lange's "constant yelling demanding drinking water." Id. On or about May 27, 2016, plaintiff complained to C.O. Merante that he was negatively effected by inmate

3

Lange's drinking water restriction. Id. at 6. C.O. Merante informed plaintiff that if he signed off on the keep separation request from Lellan and James Smith, he would be moved to the "D" block housing unit. Id.

A wheelchair-bound inmate regularly left feces on the toilet, inside the sink, on the sink buttons, and on the floor of plaintiff's housing unit. Compl. at 6. Feces would also be "all over the housing unit from the wheels of his wheelchair," as well as on the floor outside of plaintiff's cell, and on the telephone located in front of plaintiff's cell. Id. On to about May 29, 2016, plaintiff asked C.O. Dallas if he could clean the shower, toilet, sink, and housing unit. Id. Plaintiff's request was denied. Id. Plaintiff informed C.O. Dallas that his cell smelled of feces "that was tracked into plaintiff[']s cell through his sneakers." Id. Plaintiff informed C.O. Dallas that he was unable to wash his hands after touching his "feces smelling sneakers," requested another pair of county-issued sneakers. Id. C.O. Dallas told plaintiff that C.O. Merante submitted a work order for plaintiff's cell sink. Id. at 6-7. Plaintiff's request for new sneakers was denied. Id. On May 31, 2016, plaintiff requested a new pair of sneakers from C.O. Burger; that request was ignored. Id. at 7. Plaintiff again complained that the housing unit smelled of feces, and he was allowed to clean the housing unit, his cell, and the shower. Id. That same day, plaintiff complained to C.O. Merante that his cell water still was not working. Id. at 7. C.O. Merante informed plaintiff that he had submitted a work order for the cell sink. Id. That same day, plaintiff's neighboring inmates continued to cause a disturbance in the housing unit, and defendants "refused to attempt to remedy the disturbances created by either inmate." Id. On or about June 1, 2016, plaintiff asked C.O. Spano if the "B" housing block

inmates could shower before the wheelchair-bound inmate.  Id.  Plaintiff's request was denied "resulting in the housing unit to [sic] smell of body odor and feces that was tracked throughout the housing unit by the wheels of . . . [the] wheelchair."  Id.  Plaintiff requested that he be able to clean the soiled areas, but his request was denied.  Id.

## B. Defendants' Recitation of the Facts

In support of their motion, defendants filed a Statement of Material Facts.[3]  Plaintiff never spoke directly to Lt. Gardner, Lt. Hilscher, or Capt. Lanphear as to whether they ordered that he be placed on "cell confinement."  Dkt. No. 50-5 ¶ 3.  Lt. Gardner, Lt. Hilscher, or Sgt. Delaney did not order that plaintiff be placed on "cell confinement," nor did they ever receive a complaint from plaintiff regarding his cell placement.  Id. ¶¶ 4, 5, 7, 8, 10, 11.  Lt. Gardner,

---

[3] Local Rule 7.1(a)(3) states:

> Summary Judgment Motions
>
> Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.
>
> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R.  7.1(a)(3).

Lt. Hilscher, and Sgt. Delaney did not have the authority to take action regarding plaintiff's cell placement.  Id. ¶ 6, 9, 12.  On May 11, 2016, plaintiff was moved to a new cell in "D" housing unit due to his security classification.  Id. ¶ 13.  Plaintiff refused to cooperate with corrections staff during the move.  Id.  That same day, plaintiff requested and was granted a "Keep Separate" order with regard to two inmates housed in the "D" housing unit.  Id. ¶ 14. After plaintiff refused to move to the "D" housing unit, corrections staff relocated him to a holding cell.  Id. ¶ 15.  While in the holding cell, Jail Administrator, Capt. Lanphear informed plaintiff that if he refused to go to the "D" housing unit because of his "Keep Separate" order, the only cell available for his security classification was in the "C" housing unit.  Id. ¶ 16.  Capt. Lanphear told plaintiff that if he chose to be housed in that cell, he would be "locked in," as staff was assigned to be inside the unit conducting constant supervision of other inmates.  Id. ¶ 17.  Plaintiff was placed in the "C" housing unit due to cell availability consistent with plaintiff's security classification and plaintiff's "stated desire" not to be housed in the "D" housing unit, not as a result of any disciplinary-related charge.  Id. ¶ 19.

Between May 11, 2016 and June 4, 2016, there were occasions where plaintiff was moved from the "C" housing unit to a unit where he was not subject to constant supervision. Dkt. No. 50-5 ¶ 20.  On those occasions, plaintiff was not locked in his cell.  Id.  When inmates are locked in their cells for disciplinary reasons, they are not permitted to leave their cells to attend recreation or the law library.  Id. ¶ 21.  Between May 11, 2016 and June 4, 2016, plaintiff was permitted to attend recreation on a daily basis, leave his cell for showers, and attend the law library and church services.  Id. ¶ 22.  The only time and the only reason plaintiff

was locked in his cell during that time period was if he was housed on a unit where staff was conducting constant supervision of other inmates.  Id. ¶ 23.

At some point between May 16, 2016 and May 23, 2016, plaintiff complained to jail staff that "an inmate named McCalop was causing disturbances which were preventing [him] from sleeping during the daytime hours." Dkt. No. 50-5 ¶ 25.  During his deposition, plaintiff testified that inmate McCalop "was the problem."  Id. (quoting Dkt. No. 50-4 at 54) (internal quotation marks omitted). Plaintiff further testified that inmate Lange was "pretty loud at times, but it was bearable."  Id. ¶ 27.  Plaintiff signed a "Keep Away" order that resulted in inmate McCalop's relocation away from plaintiff.  Id. ¶ 28.  Plaintiff slept frequently during the ten days he claims he was deprived of sleep.  Id. ¶ 29.  On May 15, 2016, plaintiff claims that he complained to Corp. Buckley that the disturbances created by other inmates disrupted his sleep and cause him physical problems.  Id. ¶ 30.  That same day, Corp. Buckley contacted the medical unit, and medical personnel examined plaintiff the next day.  Id. ¶ 3.  With regard to the disturbances, Corp. Buckley advised plaintiff that he was housed on the unit "pursuant to the decision of Jail Administrator, Capt. [Lanphear]."  Id. ¶ 32.  Corp. Buckley did not have the authority to relocate plaintiff to another housing unit.  Id. ¶ 33.

Plaintiff claims that on May 23, 2016, C.O. Rockefeller turned off the water valve that provided drinking water to his cell pursuant to another inmate's drinking water restriction. Dkt. No. 50-5 ¶ 34.  If C.O. Rockefeller did turn off the water valve it would have been done so on orders from his supervisor.  Id. ¶ 35.  C.O. Rockefeller provided plaintiff with a gallon of water. Id. ¶ 36.  Plaintiff had access to drinking water each day during daily recreation.  Id. ¶ 37.

Plaintiff also had access to water and/or liquids at meals three times a day. Id. ¶ 38. In response to plaintiff's complaints, C.O. Merante submitted a work order, and a maintenance worker rectified the plumbing issue. Id. ¶¶ 39, 40. During that time, multiple cells were without water. Id. ¶ 39. Neither C.O. Merante nor C.O. Rockefeller had the authority to control water intake to the cells, including whether the water valves were shut off. Id. ¶ 41.

Plaintiff contends that on May 27, 2016, an inmate, who was confined to a wheelchair and used a "feces bag," was transferred to his housing unit. Dkt. No. 50-5 ¶ 42. Plaintiff was exposed to the inmate's feces that was left throughout the unit. Id. The inmate with the "feces bag" "dealt with all issues related to his condition and the 'bag' within his own cell." Id. ¶ 46. Plaintiff was allowed cleaning products to clean his cell and the housing unit on numerous occasions. Id. ¶ 47. C.O. Dallas, C.O. Burger, and C.O. Spano spent hours within the housing unit while assigned to constant supervision of other inmates in the unit during the time period plaintiff claims that he was exposed to another inmate's feces, and were exposed to the identical conditions plaintiff claims were present. Id. ¶¶ 48, 49. C.O. Dallas, C.O. Burger, and C.O. Spano did not observe any feces-related issues in the housing unit. Id. ¶ 49. Plaintiff had an opportunity to clean his sneakers, if he chose to do so, while attending daily recreation. Id. ¶ 50. Plaintiff testified that corrections officers wiped down anything within the housing unit that the other inmate touched. Id. ¶ 52. He also testified that inmates cleaned their cells and cell blocks. Id. ¶ 53.

## II. Discussion[4]

## A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is

---

[4] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally," . . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## B. Conditions of Confinement

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (citing Benjamin v. Fraser, 343 F.3d 35, 49 (2d Cir. 2003), overruled on other grounds by Caiozzo v. Koreman, 581 F.3d 63, 70 (2d Cir. 2009). In order to establish a claim for unconstitutional conditions of confinement, a pretrial detainee must demonstrate that the

defendants "acted with deliberate indifference to the challenged conditions." Id. (citing Benjamin, 343 F.3d at 50). Thus, a pretrial detainee "must satisfy two prongs to prove a claim, an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a 'subjective prong' — perhaps better classified as a 'mens rea prong' or 'mental element prong' — showing that the officer acted with at least deliberate indifference to the challenged conditions." Id.

As to the objective prong, the analysis mirrors that of the Eighth Amendment: the deprivation must be "sufficiently serious [such] that [the inmate] was denied the minimal civilized measure of life's necessities[.]" Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation marks and citation omitted); Darnell, 849 F.3d at 30 (citation omitted). "[T]he inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." Walker, 717 F.3d at 125. This includes any risk of serious damage to "physical and mental soundness." Darnell, 849 F.3d at 30 (quoting LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir. 1972)) (internal quotation marks omitted).

> There is no "static test" to determine whether a deprivation is sufficiently serious; instead, "the conditions themselves must be evaluated in light of contemporary standards of decency." For example, "[w]e have held that prisoners may not be deprived of their basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health."

Darnell, 849 F.3d at 30 (internal citations omitted). In assessing whether unsanitary conditions of confinement amount to a constitutional violation, the court must look to the severity and

duration of those conditions, "on a case-by-case basis." Id. (citing Willey v. Kirkpatrick, 801 F.3d 51, 66-68 (2d Cir. 2015)).

As to the "subjective," or "mens rea," prong, the pretrial detainee-plaintiff must establish that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35.  The plaintiff must demonstrate that "an official acted intentionally or recklessly, not merely negligently." Id. The Second Circuit reasoned that after the Supreme Court's decision in Kingsley v. Hendrickson, 135 S. Ct. 2466 (2015),

> it is plain that punishment has no place in defining the mens rea element of a pretrial detainee's claim under the Due Process Clause. Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm.

Darnell, 849 F.3d at 35.


### 1. Sleep Deprivation

Plaintiff contends that the noise from inmates in neighboring cells prevented him from sleeping.  Am. Compl. at 4-5.  Plaintiff also claims that he could not sleep because the housing unit's lights were kept on all day and night. Id. at 5.  The sleep deprivation caused

12

plaintiff to suffer "breathing problem[s], chest pain, and anxiety attacks." Dkt. No. 54 ("Pl. Opp.") at 37. Defendants argue that plaintiff's sleeping issues were caused by one individual inmate who was removed from the unit, and that evidence demonstrates that plaintiff slept during the applicable time period. See Def. Mem. of Law at 6-7.

It is well-settled in this Circuit that conditions of confinement that prevent an inmate or pretrial detainee from sleep may violate the Eighth Amendment. See Walker, 717 F.3d at 126 ("[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment."); accord Tafari v. McCarthy, 714 F. Supp. 2d 317, 367 (N.D.N.Y. 2010) ("Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights."). Further, "[r]equiring inmates to live in constant illumination can . . ., under certain circumstances, rise to the level of an Eighth Amendment violation." Barnes v. Cnty. of Monroe, 85 F. Supp. 3d 696, 739 (W.D.N.Y. 2015) (citation and internal quotation marks omitted). Moreover, excessive noise affecting an inmate's sleep may constitute a constitutional violation. See Jones v. Rock, No. 9:12-CV-0447 (NAM/TWD), 2013 WL 4804500, at *9-10 (N.D.N.Y. Sept. 6, 2013) (concluding that the plaintiff's allegations of excessive noise in his housing unit that prevented him from sleeping "arguably satisfy" the objective component of the analysis).

Applying these principles, the undersigned finds that plaintiff has failed to demonstrate a Fourteenth Amendment violation. As to the excessive noise caused by neighboring inmates, plaintiff contends that on May 13, 2016, his neighbor "began to scream, yell, kicking and banging on he cell walls and cell bars." Pl. Opp. at 35. Plaintiff claims that C.O. Merante

13

was present during the inmate's outburst, and did not take any action or was otherwise concerned with this inmate's behavior. Id.[5] However, plaintiff testified that the "noise problem" was caused by inmate McCalop, and that inmate McCalop was relocated to a different housing unit after plaintiff signed a "keep away order." Dkt. No. 50-4 ("Pl. Dep.") at 53-54. To the extent that inmate Lange contributed to the noise, plaintiff testified that "Lange was pretty loud at times, but it was bearable." Id. at 54. Thus, by plaintiff's own admission, the "noise problem" subsided once inmate McCalop was removed from the housing unit. See id. at 53-54. As to plaintiff's complaints of "[e]xposure to light for 24 hour[s] per day," plaintiff claims that on or about May 15, 2016, non-party C.O. Casey Miller informed him that his supervising officer ordered that the cell lights and housing unit lights remain on "all day and night" due to a disturbance caused by another inmate. Pl. Opp. at 36; Am. Compl. at 5. Plaintiff does not allege how long the alleged constant illumination persisted, or how often he was unable to sleep. In fact, defendants have proffered Shift Log Entry Summaries that establish that, during the relevant period, plaintiff appeared to regularly sleep through the night. See Dkt. No. 50-3 at 9-12, 14-46. Plaintiff also admitted that he "frequently slept during his cell confinement from May 13, 2016 through June 4, 2016." Pl. Opp. at 27; see Pl. Dep. at 55 ("Yeah, I slept."). Allegations that plaintiff suffered "some sleep deprivation" are insufficient to constitute a sufficiently serious deprivation under the Eighth or Fourteenth Amendment. See Holmes v.

---

[5] Plaintiff does not name the inmate in his opposition papers. It is unclear to what instance of disturbance plaintiff is referring as he cites to a passage from his original complaint which describes conduct by inmate Agan occurring on that date, but also refers to the shift log entries proffered by defendants referencing conduct by inmate McCalop. See Pl. Opp. at 35 (citing Dkt. No. 1 at 9; Dkt. No. 50-3 at 40-42).

<u>Fischer</u>, No. 09-CV-00829S(F), 2016 WL 552962, at *17 (W.D.N.Y. Feb. 10, 2016) (granting the defendants' motion for summary judgment where the plaintiff failed "to allege that such illumination resulted in anything more than some sleep deprivation which has consistently been held below the requisite severity for an Eighth Amendment claim.").

Assuming that the conditions plaintiff alleges satisfy the objective prong of the analysis, the undersigned finds that plaintiff has failed to demonstrate that defendants "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." <u>Darnell</u>, 849 F.3d at 35. To the extent that plaintiff complained to C.O. Merante or Corp. Buckley that the excessive noise and/or constant cell illumination in the housing unit prevented him from sleeping, Am. Compl. at 5; Pl. Opp. at 35, C.O. Merante and Corp. Buckley both stated that he did not have the authority to transfer plaintiff to another housing unit or move the other inmates away from plaintiff. Dkt. No. 50-10 ("Merante Aff.") ¶ 12; Dkt. No. 50-14 ("Buckley Aff.") ¶ 4. Corp. Buckley further stated that when plaintiff complained to him that he was not feeling well on May 15, 2016, he contacted the medical department on plaintiff's behalf. Buckley Aff. ¶ 5; Dkt. No. 50-3 at 50 (detailing shift log from Corp. Buckley for May 14, 2016: "Inmate complaining about being in B Block . . . . Inmate now states he is having an anxiety attack and is having chest pains . . . . Called [the nurse] and left msg to inform her of situation, as I was informed that inmate Gilmore complained of same symptoms last night and was seen by [the nurse] and returned to Block."). The record

indicates that plaintiff was seen by medical on May 17, 2016. <u>See</u> Dkt. No. 50-3 at 33 (noting that plaintiff left for and returned from medical on May 16, 2016). Moreover, it cannot be said that defendants recklessly failed to mitigate the risk that either condition posed as the shift summaries demonstrate that plaintiff slept – or appeared to sleep – regularly. <u>See</u> Dkt. No. 50-3 at 9-12, 14-46.

Thus, as plaintiff has failed to meet either prong of the analysis, he has failed to demonstrate that his sleep deprivation constituted an unconstitutional condition of confinement. Accordingly, it is recommended that defendants' motion on this ground be granted.

### 2.  Water Deprivation

Plaintiff contends that he was deprived of drinking water from May 23, 2016 through June 2, 2016. <u>See</u> Am. Compl. at 5. Defendants argue that plaintiff had access to water throughout the relevant period. Def. Mem. of Law at 7-8. "Where a prisoner alleges that he or she was denied drinking water in his or her cell, the resolution of the claim hinges on whether the prisoner received fluids at other times or suffered any adverse effects." <u>DeBlasio v. Rock</u>, No. 9:09-CV-1077 (TJM/GHL), 2011 WL 4478515, at *17 (N.D.N.Y. Sept. 26, 2011). The record seems to suggest that plaintiff's deprivation of water claim can be traced to two causes: lack of drinking water due to (1) inmate Lange's water restriction; and (2) a broken cell sink.

On May 23, 2016, inmate Lange was placed on a water restriction, and the sink in his

cell was turned off "[p]er request of the medical department." Dkt. No. 50-3 at 4. Plaintiff testified that because he and inmate Lange's cell "shared the same water valve," he did not have access to running water in his cell. Pl. Dep. at 41-42. That same day, C.O. Rockefeller provided plaintiff with one gallon of water. Pl. Dep. at 44; <u>see</u> Pl. Opp. at 38 ("Plaintiff was provided with one gallon of drinking water on May 23, 2016, by the defendant Rockefeller."). On May 27, 2016, plaintiff transferred to the "B block" where the sink "[j]ust wasn't working." Pl. Dep. at 44-45. On June 2, 2016, a maintenance worker fixed the sink, and plaintiff had access to water in his cell. <u>Id.</u> at 52.

The record is clear that plaintiff had access to and received fluids from May 24, 2016 through June 2, 2016. <u>See DeBlasio</u>, 2011 WL 4478515, at *17. As to the three days that plaintiff allegedly did not have access to drinking water in his cell due to inmate Lange's water restriction, plaintiff admits that he received one gallon of water on May 23, 2016 – the day that the water valve was turned off. Pl. Dep. at 44; <u>see</u> Pl. Opp. at 38. Throughout the entire ten-day period, plaintiff admits that he was able to drink water during outside recreation, and that he was provided with water and/or liquids three times a day with his meals. Pl. Opp. at 38. To the extent that plaintiff contends that he did not attend outdoor recreation every day, and thus, suggests that he was not able to drink water, <u>see id.</u>, plaintiff does not allege, and the record does not support a conclusion, that defendants prevented plaintiff from attending outside recreation. <u>See generally</u> Dkt. No. 50-3. Thus, as plaintiff had access to water during the ten-day period, the undersigned finds that the lack of access to running water in his cell does not amount to a sufficiently serious deprivation under the Eighth or the Fourteenth

Amendments. See Smith v. Fischer, No. 13-CV-6127-FPG, 2016 WL 3004670, at *16 (W.D.N.Y. May 23, 2016) ("Notably, Smith has not at all alleged that he was without access to water for any period of time; he has merely alleged that his in-cell water was turned off after he was accused of flooding his cell. This sort of deprivation does not constitute a denial of the "minimal civilized measure of life's necessities."); Lunney v. Brureton, No. 04 Civ. 2438(LAK)(GWG), 2007 WL 1544629, at *15 (S.D.N.Y. May 29, 2007) ("Even if Lunney's cell sink lacked running water for five days, as he claims, he does not show an Eighth Amendment violation given that there is no evidence that he was deprived of water entirely during this period."); James v. Monroe Cnty. Jail, No. 04-CV-0524E(SC), 2005 WL 2030730, at *3 (W.D.N.Y. Aug. 23, 2005) (citing cases in support of the proposition that there is no constitutional violation where plaintiff lacked running water in his cell for approximately one week, but had access to water and other fluids).

Plaintiff seems to suggest that he suffered "adverse effects" during the ten-days he lacked running water in his cell including heightened uric acid, protein, and calcium levels, as well as gout. See Pl. Opp. at 37-39. To the extent that plaintiff proffers hospital records from July 2016 depicting his uric acid, protein, and calcium levels, the records do not indicate that these levels are related to the ten days that plaintiff did not have running water in his cell. See Dkt. No. 54-1 at 21-23. Moreover, plaintiff suggests that he suffered swelling of his hands and fingers, and mental disorientation. Pl. Opp. at 39. These symptoms are not reflected in the documents plaintiff proffered. See Dkt. No. 54-1. Insofar as the documents reference that plaintiff complained of a "right sided headache for 2 weeks, kidney area pain 2 weeks," they

are noted as plaintiff's subjective complaints, and there is no indication that the nurse connected these complaints to plaintiff's uric acid, protein, or calcium levels, or the lack of running water in his cell.  Id. at 20; cf. Atkins v. Cnty. of Orange, 372 F. Supp. 2d 377, 406 (S.D.N.Y. 2005) (denying the defendants' motion for summary judgment where the plaintiff raised a triable issue of material fact as to whether the defendants subjected her to constitutional conditions of confinement by depriving her of water in her cell for one month, even though she had access to liquids at meals, where her medical records established she suffered adverse effects from the deprivation).  Insofar as plaintiff suggests this connection, the undersigned again notes that during the ten-day period he was without running water in his cell, he had access to water and/or liquids at recreation and with meals three times a day. See supra.  Thus, the undersigned finds that plaintiff has not demonstrated that he suffered adverse effects from the lack of running water in his cell.  See DeBlasio, 2011 WL 4478515, at *17.

Accordingly, as plaintiff has failed to satisfy the objective component of the analysis, it is recommended that defendants' motion on this ground be granted.

### 3. Unsanitary Conditions: Exposure to Fecal Matter

Plaintiff contends that he was exposed to fecal matter in his housing unit, and defendants prevented him from obtaining cleaning products.  See Am. Compl. at 6-7. Defendants deny that plaintiff was exposed to fecal matter, and claim that the corrections officers working in the housing unit were exposed to the same conditions that plaintiff was

exposed in the unit. See Def. Mem. of Law at 8-9. A plaintiff's general allegations that he was exposed to unclean conditions are insufficient to constitute an Eighth Amendment violation. See Williams v. Carbello, 666 F. Supp. 2d 373, 379 (S.D.N.Y. 2009). Courts have held that "chronic exposure to human waste will give rise to a colorable [§ 1983] claim." Florio v. Canty, 954 F. Supp. 2d 227, 234 (S.D.N.Y. 2003) (internal quotation marks omitted) (quoting Ortiz v. Dep't of Corr., No. 08 Civ. 2195, 2011 WL 2638137, at *6 (S.D.N.Y. Apr. 29, 2011), report and recommendation adopted, 2011 WL 2638140 (S.D.N.Y. July 5, 2011). However, "where exposure to such waste is intermittent or limited to a matter of hours, courts normally will not entertain such actions." Id. Plaintiff claims that an inmate that used a "feces bag" transferred into his housing unit on May 27, 2016. Pl. Opp. at 39. Plaintiff contends that the housing unit was not cleaned for the next four days. Id. The inmate's soiled clothes were left on the housing unit floor, and feces "was left and tracked throughout the housing unit." Id. Every time the inmate used the telephone, "a strong odor or feces would be inside of plaintiff's cell." Id. On or about May 29, 2016, plaintiff tracked feces into his cell on his sneakers. Id. at 40, 43. Plaintiff contends that defendants deprived him of cleaning supplies and forced him to live in these conditions from May 29, 2016 through June 1, 2016. Id. at 40.

The undersigned finds that, after assessing the facts set forth in the record, plaintiff fails to establish that these conditions amount to a constitutional violation. See Darnell, 849 F.3d at 30 (citing Willey v. Kirkpatrick, 801 F.3d 51, 66-68 (2d Cir. 2015)). As to the duration of the conditions, the record is clear that plaintiff remained in the conditions he alleged for a period of four days — from May 29, 2016 until June 1, 2017. See Pl. Opp. at 39-43. Prior to

his release from this housing unit on June 4, 2016, the record is clear that plaintiff was provided cleaning supplies on June 2, 2016 and June 3, 2016, and utilized them to clean his cell and the shower. See Dkt. No. 50-3 at 29. Although courts have generally held that exposure to feces for "several consecutive days" may constitute an Eighth Amendment violation, see Gaston v. Coughlin, 249 F.3d 156, 165-66 (2d Cir. 2001), "where an inmate's exposure to waste lasts for three or four days, the Circuits are split." Ortiz, 2011 WL 2638137, at *7 (citing cases). The undersigned finds that the lack of severity associated with the conditions plaintiff alleges tempers the four-day duration.

It has been held that "extreme deprivations are required to make out a conditions-of-confinement claim." Hudson v. McMillian, 503 U.S. 1, 9 (1992). In Johnson v. Fischer, this Court assessed whether the plaintiff's exposure to fecal matter amounted to a sufficiently serious deprivation under the objective component of the Eighth Amendment analysis. See Johnson v. Fischer, No. 9:12-CV-00210, 2015 WL 670429, at *11 (N.D.N.Y. Feb. 17, 2015), report-recommendation and order adopted by 2012 WL 5866524 (N.D.N.Y. Nov. 19, 2012). This Court noted that in Gaston, the Second Circuit reversed finding of summary judgment in defendants' favor where the plaintiff "presented evidence that the area directly in front of his cell was 'filled' with human feces, urine, and sewage water for several consecutive days." Id. (quoting Gaston, 249 F.3d at 165-66). Other courts analyzing extended exposure to feces allowed those Eighth Amendment claims to proceed. See id. However, this Court noted that "where claims in shorter-duration cases have survived dispositive motions, they have involved appalling conditions such as a 'feces-covered cell,' a 'waste-filled cell,' or a cell with no

21

working toilet." Id. (citation omitted).  Thus,  in Johnson, this Court found that the plaintiff's allegations that he was housed ten feet away from heating system covered in feces "do not compare, objectively, to the feces-filled environments to which the plaintiffs in cases that survived summary judgment were exposed." Id.

Similarly, in this case, the undersigned finds that plaintiff's allegations of feces "tracked" in the housing unit, as set forth supra, pale in comparison, objectively, to "feces-filled environments" wherein courts have sustained an Eighth Amendment claim. Johnson, 2015 WL 670429, at *11; see Willey, 801 F.3d at 66-68 (reversing the district court's dismissal of the plaintiff's Eighth Amendment conditions of confinement claim where the plaintiff alleged that he remained naked in a strip cell and exposed to at least seven days of human waste); Ordonez v. Beatty, No. 9:15-CV-1198 (DNH/DEP), 2017 WL 4325780, at *6 (N.D.N.Y. Aug. 22, 2017) (denying the defendants' motion for summary for summary judgment where the plaintiff alleged that his "cell was beyond filthy, caked up with garbage on the floor, feces splattered on the left + right of the cell walls, the smell of urine + feces in the cell . . . [and that ] the toilet was inoperable, cl[o]gged with urine + feces, and the floor area around the toilet . . . was plastered with dry feces and urine."); Smith v. United States, No. 9:09-CV-729 (TJM/DRH), 2011 WL 777969, at *2, 11 (N.D.N.Y. Feb. 3, 2011), report-recommendation and order adopted by 2011 WL 776150 (N.D.N.Y. Mar. 1, 2011) (denying the defendants' motion for summary judgment where the plaintiff alleged that officers "refused to flush the toilet or provide the inmates with toilet paper for two weeks," causing overflow of human waste to spill onto cell floor and the plaintiff to become "nauseous and lightheaded from the odor").  Nor is

22

the duration of the conditions sufficient to render the lack of severity sufficiently serious. <u>See</u> <u>Samms v. Fischer</u>, No. 9:10-CV-0349 (GTS/GHL), 2011 WL 3876528, at *14 (N.D.N.Y. Mar. 25, 2011), <u>report-recommendation and order adopted by</u> 2011 WL 3876522 (N.D.N.Y. Aug. 31, 2011) (finding that the plaintiff's allegations that "there were 'human feces smeared all over the rec cages' *over a period of several months* and that he had to 'smell and breath[e] in the atrocious odor of feces being thrown'" sufficient to suggest unconstitutional conditions of confinement) (emphasis added).

Although plaintiff contends that on or about May 29, 2016, plaintiff tracked feces into his cell on his sneakers, Pl. Opp. at 40, 43, the undersigned notes, even though plaintiff did not have access to running water in his cell, he had other means to access water during recreation and at mealtimes to clean his sneakers. <u>See</u> Part II.B.2. <u>supra</u>. Thus, the undersigned finds that plaintiff has not demonstrated that his exposure to fecal matter "were sufficiently serious to constitute objective deprivations of the right to due process." <u>Darnell</u>, 849 F.3d at 29. Accordingly, as plaintiff has failed to satisfy the objective component of the analysis, it is recommended that defendants' motion on this ground be granted.[6]

---

[6] To the extent that plaintiff suggest that defendants retaliated against him for requesting a keep separate order "from Lellan and James Smith," <u>see</u> Pl. Opp. at 35, 48, it must be denied as "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." <u>Thomas v. Egan</u>, 1 F. App'x 52, 54 (2d Cir. 2001) (summary order) (citing <u>Beckman v. United States Postal Serv.</u>, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)); <u>see Jones v. Goord</u>, 435 F. Supp. 2d 221, 261 (S.D.N.Y. 2006) (same). Nevertheless, plaintiff's conclusory allegations against defendants fail to establish a prima facie retaliation claim — i.e., "'(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" <u>Espinal v. Goord</u>, 558 F.3d 119, 128 (2d Cir. 2009) (quoting <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 380 (2d Cir. 2004)). Plaintiff has failed to establish that his keep separate request constitutes protected conduct, or that defendants confined plaintiff in response to that request.

## C. Due Process

Plaintiff claims that Sgt. Delaney, Lt. Gardner, Lt. Hilscher, and Capt. Lanphear violated his due process rights by restricting him to "cell confinement" from May 11, 2016 through June 4, 2016.  See Compl. at 8-9, 18-19.  Defendants argue that because plaintiff failed to demonstrate that the conditions of his confinement represented an atypical and significant hardship when compared with the ordinary incidents of prison life, his procedural due process claim must fail.  Def. Mem. of Law at 9-10. The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall ... deprive any person of life, liberty, or property without due process of law."  U.S. CONST. AMEND. XIV § 1. It is important to emphasize that due process "does not protect against all deprivations of liberty.  It protects only against deprivations of liberty accomplished without due process of the law." Baker v. McCollan, 443 U.S. 137, 145 (1979) (internal quotation and citations omitted).  "A liberty interest may arise from the Constitution itself, . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson v. Austin, 545 U.S. 209, 221 (2005) (citations omitted).

As a pretrial detainee, plaintiff's "liberty interest in freedom from restraint is highly qualified and must be balanced against the state's reasons for restraining that liberty[; thus,] restrictions on pretrial detainees . . . may not amount to punishment . . . ." Benjamin v. Fraser, 264 F.3d 175, 188 (2d Cir. 2001) (citations and internal quotation marks omitted).  Unlike convicted prisoners, who must satisfy the standard of "atypical and significant hardship" outlined in Sandin v. Conner, 515 U.S. 472 (1995),[7] a pretrial detainee need not meet such

---

[7] The undersigned notes that while defendants argue that plaintiff must show that the conditions of his confinement imposed an "atypical and significant hardship," Def. Mem. of Law at 10, this standard is

24

a stringent standard because "[a] detainee's interest in freedom from unjustified infliction of pain and injury is more substantial . . . ." Id. at 188-90; see also Iqbal v. Hasty, 490 F.3d 143, 146 (2d Cir. 2007), rev'd on other grounds, Ashcroft v. Iqbal, 556 U.S. 662 (2009) ("Th[e Second Circuit] has said that Sandin does not apply to pretrial detainees and that, accordingly, pretrial detainees need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.").

### 1. Procedural Due Process

To state a claim for procedural due process, there must first be a liberty interest which requires protection.  See generally Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due process questions [are analyzed] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (citing Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989)).  "Aside from any state policy or regulation, the force of the Due Process Clause itself protects pre-trial detainees from restrictive confinement."  Shine v. Hofmnn, No. 06-CV-237, 2009 WL 2179969, at *5 (D. Vt. July 22, 2009) (citing Kentucky Dep't of Corr., 490 U.S. at 459-60).

As previously discussed, the Second Circuit has determined that pretrial detainees

---

inapplicable to pretrial detainees.  See, e.g., Wilson v. Calderon, 14 Civ. 6209, 2017 WL 2881153, at *12 n.11 (S.D.N.Y. July 6, 2017) ("[A] pretrial detainee 'need not show that an imposed restraint imposes atypical and significant hardships to state deprivation of a liberty interest protected by procedural due process.' "), report-recommendation and order adopted by 2017 WL 3209148 (S.D.N.Y. July 27, 2017).

may not be subjected to punishment prior to an adjudication of guilt. <u>Benjamin</u>, 264 F.3d at

188 (citing <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 (1979)). In determining whether a restriction is

punitive, a court may consider

> whether the sanction involves an affirmative disability or restraint,
> whether it has historically been regarded as punishment, whether
> it comes into play only on a finding of scienter, whether its
> operation will promote the traditional aims of
> punishment—retribution and deterrence, whether the behavior to
> which it applies is already a crime, whether an alternative
> purpose to which it may rationally be connected is assignable ...
> and whether it appears excessive in relation to the alternative
> purpose assigned . . . .

<u>Bell</u>, 441 U.S. at 537–38 (quoting <u>Kennedy v. Mendoza-Martinez</u>, 372 U.S. 144, 168-69

(1963)).

> Absent a showing of an expressed intent to punish, the
> determination whether a condition is imposed for a legitimate
> purpose or for the purpose of punishment generally will turn on
> whether an alternative purpose to which the restriction may
> rationally be connected is assignable for it, and whether it
> appears excessive in relation to the alternative purpose
> assigned to it. Thus, if a particular condition or restriction of
> pretrial detention is reasonably related to legitimate
> governmental objective, it does not, without more, amount to
> punishment. Conversely, if a restriction or condition is not
> reasonably related to a legitimate goal — if it is arbitrary or
> purposeless — a court permissibly may infer that the purpose of
> the governmental action is punishment that may not
> constitutionally be inflicted upon detainees      . . . .

<u>Id.</u> at 538-39 (internal quotation marks and alterations and citations omitted); <u>see also</u>

<u>Benjamin</u>, 264 F.3d at 188.

The shift log entries proffered by defendants show that on May 11, 2016, plaintiff was

placed in "Administrative segregation per Sgt. Delaney." Dkt. No. 50-3 at 27. Capt. Lanphear

stated that plaintiff was moved to a new cell on that day "due to his security classification status."   Dkt. No. 50-6 ("Lanphear Aff.") ¶ 3 (citing Dkt. No. 50-3 at 1-3) (noting in the "Movement Reason" column that plaintiff was moved because of "classification" and reorganization").  Because the only available unit was in C unit, Capt. Lanphear advised plaintiff that "due to staff being assigned inside of that housing unit to conduct constant supervision of inmates, if plaintiff were to go to that unit, he would have to remain locked in." Id.  Plaintiff remained in this housing assignment until June 4, 2016 when "an opening was available on another housing unit that plaintiff was eligible for based on his security classification[.]" Id. ¶ 11.  Plaintiff was confined in this constant supervision housing unit for twenty-three days.

Where a pretrial detainee's detention in segregation is punitive, rather than administrative, it is governed by the standard set forth in Wolff v. McDonnell, 418 U.S. 539 (1974), "which requires written notice of the charges at least twenty-four hours before any hearing, a written statement of factual allegations against the inmate, and at least a limited ability to present witnesses and evidence." Taylor v. Santana, No. 05 Civ. 1860(AKH), 2007 WL 737485, at *4 (S.D.N.Y. Mar. 6, 2007) (citing Benjamin, 264 F.3d at 190) (additional citation omitted).  Where the pretrial detainee's detention in segregation is administrative, the confinement is assessed pursuant to the standard set forth in Hewitt v. Helms, 459 U.S. 460 (1983), which states that the detainee "must 'merely receive some notice of the charges against him and an opportunity to present his views' to the prison official charged with deciding whether to impose the restraint." Id. (citing Benjamin, 264 F.3d at 190) (additional

citation omitted).  Under <u>Hewitt</u>, prison officials may afford the detainee process "within a reasonable time" after the imposition of administrative segregation.  <u>Id.</u> (citing <u>Hewitt</u>, 459 U.S. at 476 n.8).

Aside from plaintiff's conclusory allegations in opposition that defendants placement in this constant supervision confinement was in retaliation for his "keep separate order" request, <u>see</u> Pl. Opp. at 35, 48, there is no indication in the record that plaintiff's confinement was punitive.  In his opposition, plaintiff references that he was placed in "administrative segregation cell confinement."  <u>Id.</u> at 49.  Moreover, defendants allege that plaintiff's placement was due in part to his security classification, housing availability, and plaintiff's preference to avoid certain inmates.  <u>See generally</u> Lanphear Aff.[8]  Courts in this Circuit have determined that "administrative classifications of pretrial detainees, even where the classifications come with restrictive conditions, do not give rise to a liberty interest, absent evidence of an intent to punish."  <u>Valdez v. City of New York</u>, No. 11 Civ. 05194(PAC)(DF), 2013 WL 8642169, at *8 (S.D.N.Y. Sept. 3, 2013) (collecting cases).  Moreover, it has been held that "the transfer of an inmate to less amendable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause itself."  <u>Covino v. Vermont Dep't of Corrections</u>, 933 F.2d 128, 129 (2d Cir. 1991).  The undersigned notes that during the twenty-three days plaintiff was placed in constant supervision housing unit, plaintiff had access to and attended daily recreation, showers, the law library, and church services.

---

[8] Plaintiff argues that defendants' claim that his cell placement was due to his security classification is "false," but does not proffer evidence or a nonconclusory explanation otherwise.  <u>See</u> Pl. Opp. at 52.

Lanphear Aff. ¶ 8; see Dkt. No. 50-3 at 9-51. Defendants note that "[i]f plaintiff were, in fact, subjected to locked-in status due to discipline[,] he would not have been permitted to engage in such activities." Lanphear Aff. ¶ 8. Further, as plaintiff was housed in this unit for only twenty-three days, the duration of the confinement does not "smack[] of punishment." Covino, 933 F.2d at 130 ("At some point, however, the administrative necessity for involuntary lock-up begins to pale. Indeed, after nine months, it smacks of punishment."). Thus, plaintiff's placement in the constant supervision house unit does not trigger a protected liberty interest.

Accordingly, as plaintiff fails to demonstrate that he had a protected liberty interest, it is recommended that defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants argue that even if plaintiff's claims are substantiated, they are entitled to qualified immunity. See Def. Mem. of Law at 11. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti

29

v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. See Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See subsection II.B.-C. supra. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F. Supp. 2d at 230. Accordingly, it is recommended that defendant's motion on this ground be granted.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 50) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's amended complaint (Dkt. No. 32) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.[9]

Dated: August 6, 2018
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[9] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).